**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**COURTNEY GREEN,**

                                     **REPORT AND**
                                     <u>**RECOMMENDATION**</u>

                    **Petitioner,**

     **-against-**                                    **05-CV-5795 (CBA)**

**SUSAN CONNELL, Superintendent of the Oneida**
**Correctional Facility,**

                    **Respondent.**
-----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

       In this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, petitioner

Courtney Green ("petitioner" or "Green") seeks relief from the sentence imposed upon him as

a consequence of his robbery conviction following a jury trial in New York State Supreme

Court, Kings County.  Specifically, petitioner contends that the state court violated his

constitutional right to due process by refusing to suppress identification testimony that

petitioner contends was the product of unduly suggestive pretrial procedures.  The petition was

referred to the undersigned magistrate judge by the Honorable Carol Bagley Amon for a

Report and Recommendation.  For the reasons that follow, this Court recommends that the

petition be denied and the case be dismissed.

<u>**FACTUAL BACKGROUND**</u>

**I.  The Suppression Hearing**

       Prior to trial, the Honorable Guy Mangano held an evidentiary hearing pursuant to <u>Wade</u>

<u>v. United States</u>, 388 U.S. 218 (1967), to determine whether the identification of petitioner by

the complaining witness, Christopher Pelham ("Pelham" or "complainant") was tainted by

unduly suggestive police-arranged pretrial identification procedures.  The sole witness called at the hearing was Detective Courtney Atkins of the New York City Police Department.

On October 17, 2000, Detective Atkins was assigned to investigate a robbery that had occurred on October 15, 2000, at the Fulton Street G line station in Brooklyn.  (Hearing Transcript ["H."] 7.)  He interviewed Pelham, the victim, who explained that he had been waiting on a subway platform when two black males in their twenties, between 5'8" and 5'10", 140 to 150 pounds, had approached him, with one of the men brandishing what appeared to be a sawed-off shotgun.  (H. 7-8, 28.)  One man reached into Pelham's pocket and removed his wallet, along with a Metrocard and Sprint cellular phone.  (H. 8.)

Pelham also provided the detective with a list he had obtained from Sprint, his cellphone service provider, reflecting unauthorized phone calls made from Pelham's cellphone after it had been stolen from him.  (H. 8.)  Detective Atkins ran those numbers through a database of telephone numbers called by individuals who had previously been arrested. (H. 8-9.)  One of the numbers had been called by Courtney Green.  (H. 9.)

The next day, Detective Atkins had Pelham view a computer-generated collection of more than 600 photographs of individuals who possessed physical characteristics similar to those of the men described by complainant in the initial interview; at the time of the hearing, the detective was unsure whether Green's photograph had been included in that collection.  Pelham could not identify any of the photographs. (H. 10-11, 37.)  Based on the information Detective Atkins had received from the telephone number search, he then created a six-man photo array,

including a photograph of Green,[1] which occupied the fifth position in the array. (H. 11-12.) Pelham narrowed his selection to two photos, but was unable to state whether the perpetrator was the person in the fifth or sixth photo. (H. 12.) Based on the cellphone information, Detective Atkins nevertheless focused his investigation on Green. (H. 13.)

Six days later, on October 24, 2000, Detective Atkins went to Green's home and brought him down to the police station. (H. 13-15.) Green was placed under arrest and notified of his *Miranda* rights. (H. 15-20.) In the ensuing interview, Green told Detective Atkins that he had been home with his grandmother and his girlfriend on the night in question and "if anybody's doing any robbery, it's his cousin" and another individual. According to Green, his cousin had called Green's home that night with a stolen cellphone, asking Green to identify, through Caller ID, the number he was calling from. (H. 21.)

Using the description provided by complainant (H. 8, 28), and five "fillers" recruited from the Bedford Men's Shelter (H.23),[2] Detective Atkins then assembled a six-man line-up and asked complainant to appear at the station. (H. 21, 44.) Before Pelham viewed the line-up, Detective Atkins told him that he had a suspect in custody and that the other men in the line-up were fillers. (H. 26; see H. 22.). Complainant viewed the line-up and identified 19-year-old Green as "the one that had the gun that robbed [him]." (H. 27.)

On January 22, 2002, the state court issued a written opinion refusing to suppress the identification testimony, ruling, in relevant part, that the fillers and Green were "sufficiently

---

[1] The photo array is attached to the Petition For a Writ of Habeas Corpus by a Person in State Custody ("Pet.") as Petitioner's Exhibit ("Pet. Ex.") E.

[2] The fillers ranged in age from 25 to 31 years. (H. 23.)

similar" and that complainant's prior viewing of the photo array did not render the line-up unduly suggestive. (1/22/02 Decision and Order [Pet. Ex. F] at 6-7.) The court held that "the mere fact that the complainant could not decide between two photographs in the array and then six days later identified [Green] in the line-up is not the basis for concluding that the procedures were so conducive to the possibility of irreparable misidentification requiring suppression." (Id. at 7.)

## II. The Evidence at Trial

### A. The Prosecution's Case

At trial before Justice Mangano and a jury, Christopher Pelham testified that at approximately 12:55 a.m. on October 15, 2000, at the Fulton Street subway station, he was reading a book while waiting on the platform for the Queens bound "G" train, when he was approached by two men. (Trial Transcript ["T."] 240-41.) He described the men as African-American, between the ages of 20 and 30 years old and approximately 5'8" to 5'11" in height. They were wearing casual clothing, and one had a "bit of facial hair." (T. 240.)

According to Pelham, one of the men, who "look[ed] like" defendant Courtney Green,[3] circled him and pulled out what appeared to be a sawed-off shotgun.[4] (T. 240-41.) The man who looked like Green pointed the weapon at complainant's side, while the other man, never identified, quickly went through complainant's pockets, removing a cellphone, wallet and

---

[3] Fifteen months after the robbery, Pelham was unable to positively identify petitioner in court. (T. 264.)

[4] Pelham testified that the gun "had a really long barrel . . . and it had wood underneath it . . . ." (T. 242.) Pelham thought it was a sawed-off shotgun because of its size and because of his previous experience using regular shotguns. (T. 243.) The gun was never recovered. (T. 296.)

Metrocard. (T. 240-43.)  That man took from the wallet more than $100, change and keys, and returned the wallet to complainant's pocket. The two men then ran off. (T. 243-44.)

After the two men fled, Pelham "whispered out loud" to a transit worker further down on the platform that he had just been robbed. (T. 244.)  The worker walked with him to the token booth, where the token booth clerk called the police. The police showed up a few minutes later and canvassed the area with Pelham without success. (T. 245.) At around noon the next day, Pelham called his cellphone service carrier to report his phone stolen. The Sprint operator froze his account and provided him with a list of telephone numbers that had been called from his phone since the time of the robbery. Pelham then gave this list of telephone numbers to Detective Atkins. (T. 250.)

Detective Atkins ran the numbers Pelham had given him through the police department database of calls placed by persons in custody and located a phone number listed for Green.[5] (T. 278-79.) On October 24, 2000, at approximately 7:00 a.m., Detective Atkins went to Green's home at 789 St. Marks Avenue, Apartment 10F. (T. 279.) He left with Green and placed him under arrest. (T. 281.) Detective Atkins then brought Green to the police station, interviewed him and placed him in a line-up. (T. 281.)[6]

---

[5]  The phone number was registered  to Green's grandmother, Carole Rose-Nying, at the residence they shared. (T. 338.) The number had been called four times on October 15, 2000, after the theft of the phone – at 1:55 a.m., 2:24 a.m., 3:14 a.m. and 3:41 a.m. Each of the calls was brief, no longer than two minutes long. (T. 332.)

[6]  Before the admission of the detective's testimony concerning the line-up, a sidebar was held, at which the trial court ruled that, in light of the equivocal nature of Pelham's in-court identification of petitioner, the proof was admissible under section 60.25 of New York's Criminal Procedure Law.  (T. 272-73.)

The line-up consisted of petitioner and five fillers. (T. 281.) The fillers had been recruited from the Bedford Avenue Men's Shelter. (T. 282.) When the fillers were brought to the line-up room, Green was asked to pick a position among the group. He chose position number 3. (T. 286.) After photographs were taken of the line-up (Pet. Ex. D; T. 288-89), complainant was brought in, viewed the line-up for approximately two to three minutes, and then identified Green as the perpetrator who had held the gun on the night of the robbery. (T. 251-54, 287-88.) Detective Atkins told Pelham that he had "picked the subject of the line-up." (T. 288.)

**B. The Defense Evidence**

On cross-examination, defense counsel challenged Pelham's ability to accurately identify Green as one of his assailants. Pelham admitted that he was tired the morning of the robbery, standing in poor lighting conditions on the subway platform, and that he had consumed a glass of wine a few hours prior to the incident. (T. 256.) He also admitted that when the two men approached him, he "was not staring at them" and "was avoiding eye contact with them." (T. 257.) He "could see both of them" at one point (T. 261), but did not look at the gunman "for very long at all." (T. 263.) Although Pelham could not definitively identify Green at trial as one of the robbers (T. 264), he was certain of his identification of Green at the time he viewed the line-up 15 months earlier. (T. 264, 270-71.)

The defense attempted to cast doubt upon the line-up and the police investigation. On cross-examination, Detective Atkins admitted having told Pelham, before he viewed the line-up, that there was a suspect under arrest. (T. 294.) He also conceded that he had made no attempt to recover the weapon (T. 296), nor had he visited the homes corresponding to any of the other numbers called from Pelham's cellphone on the night of the robbery. (T. 300.) Detective Atkins

had followed up on information from Green concerning another possible suspect, but his interview with Green led him to believe that Green was involved with the crime. (T. 296-97, 306.)

The defense called two alibi witnesses: Carole Rose-Nying ("Rose-Nying"), Green's grandmother, and Karen Clark ("Clark"), Green's girlfriend. Each stated that Green was home on the night of the robbery. First, Rose-Nying testified that on the October 14, 2000, she came home between 7:30 p.m. and 8:00 p.m. and saw Green at home at that time. (T. 348.) Between midnight and 1:00 a.m., she was watching television in her bedroom, and did not actually see Green; however, she knew Green and Clark were home because the light was on in his bedroom and because she heard Green (as opposed to Clark) opening and closing the refrigerator. (T. 349.) She also testified that after midnight, the phone rang five or six times, which was unusual, and that someone must have answered the phone because the answering machine did not pick up. (T. 353, 375-76.)[7]

Clark testified at trial that she had been in a relationship with Green for three and a half years. (T. 385.) On the night of October 14, 2000, she arrived at Green's home between 9:00 p.m. and 10:30 p.m. and the couple then watched two movies in his bedroom, where she spent the night. (T. 386-87.) She noted that Green's grandmother was also home lying in bed when she arrived. (T. 386-87.) She did not recall Green ever leaving the apartment, but did not remember

---

[7] When confronted with her grand jury testimony to the effect that she heard Green come home between 10:00 p.m. and 11 p.m. while she was in her room watching television and dozing (T. 368-70), Rose-Nying explained that Green was home at 8:00 p.m. when she returned home from work, but that he went out and came home again at around 11:00 p.m. (T. 370.) She denied any recollection of having told the grand jury that she had answered a call after 1:00 a.m. and instructed the person not to call the house again. (T. 373-74, 379.)

what time she fell asleep that night. (T. 387.) Clark typically spent at least three nights a week at Green's apartment, where it was unusual for the phone to ring after midnight. (T. 389.) According to Clark, on the morning of October 15, 2000, the phone rang three or more times and she was certain Green answered it once. (T. 389-90, 403-04.)

### C. The Verdict and Sentence

The jury found petitioner guilty of one count of Robbery in the First Degree and one count of Robbery in the Second Degree. (T. 511.) He was sentenced as a second violent felony offender to concurrent prison terms of ten years for the first degree robbery conviction and seven years for the second degree robbery conviction. (Sentencing Transcript 10-11.) Petitioner is currently incarcerated pursuant to that judgment of conviction.

## III. Post-Conviction History

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), arguing, in relevant part, that the line-up was unduly suggestive because (1) the detective told complainant, who had been unable to positively identify petitioner from a photo array several days earlier, that there was a suspect in the line-up; and (2) petitioner "looked distinctly younger than [] the fillers" in the line-up. (Brief for Defendant-Appellant [Pet. Ex. G] at 17-20.)

In a decision dated January 18, 2005, the Appellate Division unanimously affirmed petitioner's judgment of conviction. People v. Green, 14 A.D.3d 578 (2d Dep't 2005) (Pet. Ex. A). The Appellate Division held that the hearing court properly declined to suppress evidence of the line-up because the fillers were sufficiently similar in appearance and because Detective

Atkins' remark concerning the presence of a suspect in the line-up did not contaminate the identification since it is "implicit" that line-ups contain suspects. 14 A.D.3d at 578-79.

By letter dated February 11, 2005, petitioner sought leave to appeal to the New York Court of Appeals. (Pet. Ex. I.)  On March 31, 2005, petitioner's application was denied. People v. Green, 4 N.Y.3d 831 (2005) (Pet. Ex. B.).

Petitioner timely filed his federal habeas petition in this Court on December 13, 2005. On March 30, 2006, Judge Amon referred the petition to this Magistrate Judge for a Report and Recommendation.

## DISCUSSION

### I. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, established a deferential standard that federal habeas courts must apply in reviewing state court convictions.  Under AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits in state court only if that adjudication (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The threshold inquiry is whether the petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 390 (2000)).  A law is clearly established if it has been enunciated in the holding – as opposed to dicta – of a Supreme Court decision, whether as a generalized standard "or a bright-line rule designed to effectuate

such a standard in a particular context." <u>Kennaugh</u>, 289 F.3d at 42; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 412.

A state court decision is "contrary to" Supreme Court precedent if the court "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless" arrives at a different result. <u>Williams</u>,  529 U.S. at 406.  A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407.  In making the "unreasonable application" inquiry, the habeas court "should ask whether the state court's application of clearly established law was objectively unreasonable."  <u>Id.</u> at 409.  Given the Supreme Court's admonition that "an unreasonable application of federal law is different from an incorrect application of federal law," <u>id.</u> at 410, "[s]ome increment of incorrectness beyond error is required" before habeas relief may be granted.  <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000).

Pursuant to AEDPA, a state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1).  Such determinations are "unreasonable" only where the petitioner rebuts the presumption of correctness "by clear and convincing evidence." <u>Id.</u>

## II.  The Pretrial Identification Procedures

Petitioner seeks habeas relief on the ground that the trial court's refusal to suppress testimony concerning the line-up identification, which petitioner claims was the product of

unfair police procedures,[8] denied him his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments. Specifically, petitioner argues that the line-up procedures were impermissibly suggestive because of the ages of the fillers in the line-up, Detective Atkins' remark to complainant that there was a suspect in the line-up, and the successive displays of petitioner's photo in an array and then petitioner in a line-up, after complainant had tentatively identified petitioner and another man in the photospread.

**A. Due Process Standards**

Petitioner's challenge to the fairness of the pretrial identification procedures, and the admissibility of testimony concerning the line-up, implicates clearly established due process standards enunciated by the Supreme Court in its caselaw on identification evidence; as the trial court and Appellate Division both adjudicated the claim on the merits, AEDPA's deferential standard of review applies.[9] See Kennaugh, 289 F.3d at 42 (collecting Supreme Court cases and applying AEDPA standard to claim of tainted in-court identification because "Supreme Court precedent has set forth a due process standard . . . prohibiting the admission of unreliable eyewitness testimony . . . ."). A due process challenge to identification evidence presents a mixed question of law and fact. See Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986); Sanford v. Burge, 334 F.Supp.2d 289, 301 (E.D.N.Y. 2004). In order to obtain federal habeas relief,

_____

[8]  Petitioner does not claim that Pelham's viewing of the photo spread was unfairly suggestive, nor does he challenge the admissibility of Pelham's tentative in-court identification of him as the gunman.

[9]  "This [deferential] standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision." Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

petitioner must demonstrate that the state court's rejection of his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and/or was "based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d).

The "reliability of eyewitness identification testimony is usually an issue for jury determination," and may be excluded only to preserve the accused's due process rights when "the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification.'" Kennaugh, 289 F.3d at 43 (quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977)). The Supreme Court has established a two-pronged inquiry for determining the admissibility of identification evidence, whether a prior, out-of-court identification of the accused or an in-court identification at trial. First, the court must consider "whether the pretrial identification procedures unduly and unnecessarily suggested that the [accused] was the perpetrator." Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); see also id. ("Suggestive identification procedures 'increase the likelihood of misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's right to due process.") (quoting Neil v. Biggers, 409 U.S. 188, 198 (1972)). If the procedures were not unfairly suggestive, the court's inquiry ends; in that circumstance, "the identification evidence presents no due process obstacle to admissibility," and the reliability of the proof becomes "'a matter for the jury.'" Raheem, 257 F.3d at 133 (citing Jarrett, 802 F.2d at 42, and quoting Foster v. California, 394 U.S. 400, 442 n.2 (1969)); accord Sanford, 334 F.Supp.2d at 302. If, on the other hand, the court determines that the identification procedures were unduly suggestive, the court "must then determine whether the identification was nevertheless independently reliable," Raheem, 257 F.3d at 133,

despite the "corrupting effect of the suggestiveness . . . ." Id. at 135 (quoting Manson, 432 U.S. at 114). Even a suggestive procedure will not "in and of itself [] violate due process." Vasquez v. Poole, 331 F.Supp.2d 145, 150 (E.D.N.Y. 2004) (citing Biggers, 409 U.S. at 198); see Raheem, 257 F.3d at 135 (citing Manson, 432 U.S. at 113 n.13).

**B. The Pretrial Identification Procedures**

Petitioner contends that the "totality of the circumstances" surrounding the line-up rendered that procedure unduly suggestive. Specifically, he complains that the line-up was conducted after Pelham had viewed a photospread, from which he had selected photographs of petitioner and another individual, who was not included in the line-up. (Pet. at 16, 20; Traverse to the Answer/Memorandum of Law ["Mem."] at 2-3.) Petitioner additionally points to the fact that Detective Atkins advised Pelham, prior to viewing the line-up, that the line-up consisted of five fillers and a suspect. (Pet. at 16; Mem. at 2.) Finally, petitioner argues that his "youthful appearance" contrasted with the "older, more mature fillers in the lineup . . . ." (Pet. at 17; see Mem. at 6.) None of these challenges, alone or in combination, satisfies petitioner's burden under AEDPA.

**1. The Composition of the Line-Up**

Petitioner's challenge to the composition of the line-up is unavailing. After examining the photographs of the line-up (Pet. Ex. D), the trial court and appellate courts both concluded that "the line-up participants were sufficiently similar to [petitioner] in appearance so that he was not singled out for identification . . . ." (Pet. Ex. F at 7; see Pet. Ex. A at 1-2.) Those factual findings "are entitled to the statutory presumption of correctness" under AEDPA, Sanford, 334 F.Supp.2d at 301, which petitioner has not refuted by clear and convincing evidence. Having

examined the photographs of the line-up, this Court concurs that it cannot be said that petitioner (who was number 3 in the line-up) "so stood out from all of the others as to suggest to [complainant] that [petitioner] was more likely to be the culprit."  United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (internal quotation marks and alteration omitted); accord Jarrett, 802 F.2d at 41; see West v. Greiner, No. 01 CV 1267(JG), 2004 WL 315247, at *6 (E.D.N.Y. Feb. 12, 2004) (habeas court examines photographs of line-up and rejects challenge to its composition where "at least two of the fillers . . . appeared to be approximately the same age as [petitioner].").

In determining whether the composition of a line-up is unduly suggestive, the Court should analyze whether the accused "meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not."  Raheem, 257 F.3d at 134. "The focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness." West, 2004 WL 315247, at *15 (where witnesses' descriptions of perpetrator did not include grey hair, the fact that petitioner was the only person in the line-up with grey hair did not render the procedure unfairly suggestive); compare Solomon v. Smith, 645 F.2d 1179, 1182-84 (2d Cir. 1981) (line-up suggestive where suspect was only person meeting height and weight descriptions provided by witness), with United States v. Jacobetz, 955 F.2d 786, 803 (2d Cir. 1992) (line-up not suggestive despite fact that suspect had smallest mustache where witness had described suspect as having no facial hair at all).  All of the individuals in the array need not "be uniform with respect to a given characteristic."  Jarrett, 802 F.2d at 41.

In the present case, complainant originally described his attackers as African-American men in their twenties, between 5'8" and 5'10" in height, with slim builds. (H. 8, 28.) While petitioner was 19 at the time, and the fillers from the men's shelter were reportedly between the ages of 25 and 31 years old (H. 44),[10] the photographs of the line-up show that all of the men appeared to match the description obtained from Pelham of his assailant: African-American, slim, in their 20s; in addition, all six had similar haircuts and facial hair. (Pet. Ex. D.) The age differential appears to be slight, and that factor did not make petitioner stand out from the others in a way to suggest he was complainant's attacker.[11] Therefore, the state courts did not act unreasonably in rejecting petitioner's challenge to the composition of the line-up.

## 2. Detective Atkins' Statement

Nor did the state courts act unreasonably in concluding that the line-up procedure was not rendered suggestive by the detective's statement to complainant that one of the men in the line-up was a suspect. Indeed, as the Appellate Division observed, it is implicit in the display of a line-up that a suspect is among the persons viewed, and stating this fact to a witness is thus insufficient to create a substantial likelihood of misidentification. People v. Green, 14 A.D.3d 578, 579 (2d Dep't 2005) (Pet. Ex. A at 2) (citing state case); see Hodge v. Henderson, 761 F.Supp. 993, 1007-08 (S.D.N.Y. 1990) ("[I]t is implicit in the viewing of a lineup that a suspect might appear . . . . Such information does not predispose the viewer of the lineup to select any particular person . . . ."), aff'd, 929 F.2d 61 (2d Cir. 1991) (per curiam); see also Sales v. Harris,

---

[10] One was 31; the remainder were in their twenties. (H. 44.)

[11] Indeed, had the detective ignored Pelham's description of the age of the gunman (in his twenties), and instead used teenage fillers in an attempt to match petitioner's actual age, petitioner may well have challenged the inclusion of fillers too youthful in appearance.

675 F.2d 532, 538 (2d Cir. 1982). Neither the Supreme Court nor the Second Circuit has ever held that such a statement renders the line-up impermissibly suggestive.[12] Therefore, the state courts did not act unreasonably in rejecting petitioner's challenge to Detective Atkins' statement to complainant that there was a suspect in the line-up.

### 3. Successive Identification Procedures

Finally, petitioner suggests that the use of two successive identification procedures -- a photo array followed six days later by a line-up -- sent a clear message to complainant that petitioner was his assailant. See Pet. at 21; Mem. at 2, 5-6. However, contrary to petitioner's suggestion, "[t]he mere fact that a person called to view a lineup after selecting a photograph from police files would likely expect that suspect to be included in the lineup does not alone invalidate the fairness of the lineup. The law is clear that the police may use more than one identification procedure to identify suspects as long as the procedures utilized are fair and not suggestive. The test is not how close in time the identification procedures occur, but whether the procedures are each fairly comprised and administered." Taylor v. Kuhlmann, 36 F.Supp.2d 534, 551 (E.D.N.Y. 1999). Indeed, as one court noted, the implications of petitioner's challenge to successive procedures "are troublesome": "It suggests that witnesses that previously have

_____

[12] Indeed, in Wong, the Second Circuit rejected a challenge to a comment by a detective that, under the circumstances, presented a greater danger of prompting an identification of the accused. The victim had tentatively identified the defendant from a photo spread and had tentatively identified him in a seated line-up. Immediately before viewing him in a standing line-up, she was told by the detective that "we can't just take a 'possibly.'" 40 F.3d at 1358. The defendant argued on appeal that the victim's "hesitance in identifying [defendant] in the photo array and the seated lineup contrasts starkly with her certainty after the standing lineup, indicating that the second lineup was suggestive . . . ." Id. at 1359. The Second Circuit disagreed: "While the detective's comment created the risk of prompting an identification on something less than total certainty, it did not suggest that [the victim] choose any particular participant, nor did it confirm the correctness of her choice after it had been made." Id.

examined photographic displays involving the accused would be prohibited from participating in a defense counsel-supervised lineup. This seems unnecessary when the prior photographic [array] was not suggestive." United States v. Shakur, 560 F.Supp. 353, 358 (S.D.N.Y. 1983). Thus, where, as here, the prior photo procedures were in no way suggestive,[13] the inclusion of the same suspect in a subsequent line-up does not render the procedures unduly suggestive or somehow tainted. See Sales, 675 F.2d at 538 ("[R]egardless of whether the photo spread preceded the lineup by 24 hours, as [the detective] testified, or by ten weeks, as [the victim] testified, it is unlikely that the lineup was tainted since the prior photo procedures had not been suggestive."); accord United States v. Cherry, No. S1 94 Cr. 313 (CSH), 1995 WL 66595, at *2 (S.D.N.Y. Feb. 15, 1995); see Taylor, 36 F.Supp.2d at 551; see also Wong, 40 F.3d at 1359 (fact that a positive lineup identification followed a tentative identification from a photospread did not render the procedures unduly suggestive, even though detective told victim that "we can't just take a 'possibly.'"); Sanford, 334 F.Supp.2d at 294, 301 (rejecting habeas challenge to pretrial identification procedures where two witnesses who viewed photo array selected petitioner's photo as "resembling" the man who shot at them, and then 12 hours later positively identified him from a line-up that included five fillers from a shelter).[14]

---

[13]  Petitioner does not challenge the fairness of the photo array.

[14]  Petitioner's reliance on Foster v. California, 394 U.S. 440 (1969), is misplaced, as in that case, unlike this one, the two initial identification procedures were themselves grossly suggestive, thereby tainting the subsequent line-up. First, the accused was placed in a three-man line-up in which he stood out by virtue of his height and his wearing a jacket "similar to that worn by the robber." This procedure resulted in a tentative identification. Id. at 441, 443. Immediately thereafter, the police arranged a one-on-one confrontation between the accused and the witness -- a procedure that the Supreme Court had strongly condemned, see, e.g., Stovall v. Denno, 388 U.S. 293, 302 (1967) -- at which point the witness still was unable to make a positive

(continued...)

Petitioner further complains that "the police excluded the other possible suspect in the photo array from the lineup, . . . and thus removed the other option that the complainant was clearly considering." (Pet. at 21.) Respondent contends that this argument is procedurally barred because petitioner "failed to fairly present the claim to the state courts." (Affidavit in Opposition to Petition For a Writ of Habeas Corpus ["Opp."] at 2-4 [collecting cases].) Petitioner disagrees, claiming that he fully exhausted his argument regarding complainant's tentative identification of a second individual from the photo array. (Mem. at 3-4.)

An examination of the record in this case reveals that this aspect of petitioner's challenge was first presented in his request for leave to appeal to the New York Court of Appeals (Pet. Ex. I at 2), and was not articulated in either the trial court or the Appellate Division. (See generally H. 55; Pet. Ex. G at 17-20.) Petitioner's failure to argue this aspect of his due process challenge in the lower state courts can be viewed as creating a procedural bar to habeas review. See, e.g., Jarrett, 802 F.2d at 45 (petitioner's argument that pretrial publicity tainted identification process was not properly before the habeas court because petitioner "had not asserted it in state court . . . ."); but see Leka v. Portuondo, 76 F.Supp.2d 258, 272 (E.D.N.Y. 1999) (claim of coerced identification satisfied exhaustion requirement, despite fact that due process challenge presented in state court was based solely on composition of photo array), rev'd and remanded on other grounds, 257 F.3d 89 (2d Cir. 2001).

---

[14](...continued)
identification. Foster, 394 U.S. at 441, 443. Approximately one week later, the same witness viewed a five-man line-up that comprised the accused and four new fillers. This time, the witness positively identified the accused as the robber. Id. at 442, 443. The Court held that the police conduct -- which bears no resemblance to that in the present case -- "made it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact 'the man.'" Id. at 443.

In any event, petitioner's argument fails on the merits. In criticizing the procedures that were employed, petitioner emphasizes what the police could have done: "[T]he police could have conducted a lineup that included both possible suspects. Or they could have conducted two separate lineups each including one of the suspects. Or they could have added a third lineup which included neither. Or they could have conducted no lineup at all." (Mem. at 3.) The first two proposals would present obvious logistical problems,[15] the third would consume limited police resources for no investigative purpose, and the fourth is predicated on the erroneous assumption that once a suspect's image has been displayed in a photo spread, it is impermissibly suggestive for the police to include him in a line-up.[16] Furthermore, where, as here, "the procedures which were actually used at the identification were not impermissibly suggestive, 'it is immaterial whether any other or different procedures could have been pursued.'" Alvarez v. Keane, 92 F.Supp.2d 137, 153 (E.D.N.Y. 2000) (quoting Boyd v. Henderson, 555 F.2d 56, 59 (2d Cir. 1977)).

To be sure, the protection against suggestive identification procedures includes "the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." Raheem, 257 F.2d at 135. Nevertheless, on the particular facts of this case, the state courts found no unfair suggestiveness in the procedures utilized. Although this Court has been unable to locate any decision involving the precise fact pattern presented here, other

---

[15] Petitioner apparently recognizes the difficulties the police would face in attempting to locate, and recruit for a line-up, an individual depicted in a photograph used as a filler in a photo array. (Cf. Mem. at 3 ["[P]etitioner does not claim that the police were required to find or include the second suspect."].)

[16] But see cases cited *supra* pp. 17-18.

habeas decisions are instructive. Caselaw in this circuit has sustained the use of successive

identification procedures where the initial one was not itself impermissibly suggestive but

resulted in an identification that was equivocal. See Wong, 40 F.3d at 1358-59; Jarrett, 802 F.2d

at 37, 41; Sanford, 334 F.Supp.2d at 294, 301-03. For example, in Jarrett, the Second Circuit

reversed the district court's granting of a habeas petition, despite circumstances that were far

more indicative of impermissible suggestiveness. When first shown an array containing photos

of a dozen females, the witness, who had been uncertain as to whether the driver involved in the

robbery was a male or female, initially selected two photos; though he had difficulty choosing

between them, he eventually tentatively settled on petitioner's photo, at which point the police

investigator told the witness who she was and where she was from. Id. at 37, 38. Thereafter, the

witness saw petitioner with her counsel at the *Wade* hearing. Id. at 37. Then, on the day the

witness testified at trial, the prosecutor told him to "stick to [his] guns." Id. at 39. The Second

Circuit nevertheless concluded that none of these circumstances, "singly or in combination,

warranted [the] exclusion" of the witness' positive in-court identification of petitioner as the

driver. Id. at 46.

     As demonstrated by this analysis, the state courts acted reasonably in rejecting

petitioner's due process challenge to the fairness of the identification procedures. They therefore

had no need to -- and hence did not -- address whether Pelham's pretrial identification of

petitioner was independently reliable despite the effect of any suggestiveness: "[I]f the

[identification] procedures were not impermissibly suggestive, independent reliability is not a

constitutionally required condition of admissibility, and the reliability of the identification is

simply a question for the jury." <u>Jarrett</u>, 802 F.2d at 42 (citations omitted). The habeas court's inquiry may likewise end here.  <u>See</u> <u>Alvarez</u>, 92 F.Supp.2d at 153.[17]

<u>CONCLUSION</u>

For the foregoing reasons, it is the recommendation of this Court that Courtney Green's petition for a writ of habeas corpus be denied and the case dismissed.

Any objections to the recommendations contained herein must be filed with the Honorable Carol Bagley Amon by July 31, 2006.  Failure to file objections in a timely manner may waive a right to appeal the District Court order.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to enter this Report and Recommendation into the Electronic Case Filing System.

**SO ORDERED.**

**Dated:**     **Brooklyn, New York**
               **July 20, 2006**

                              **ROANNE L. MANN**
                              **UNITED STATES MAGISTRATE JUDGE**

---

[17]  Although neither the trial court nor the Appellate Division addressed the issue of independent reliability, both petitioner and respondent do so; they analyze the factors enumerated in <u>Neil v. Biggers</u>, 409 U.S. at 199-200, and predictably reach opposite conclusions.  (Pet. at 23-24; Opp. at 11-12.)  Given the reasonableness of the state courts' rulings on the fairness of the police procedures, the District Court should decline to reach an issue not necessary to the outcome of this case.